**COUNTY OF HILLSBOROUGH, a political subdivision of the State of Florida; ANTHONY SCHLEMAN, as Tax Collector of Hillsborough County; and J. M. LEE, as Comptroller of the State of Florida, v. KNIGHT & WALL COMPANY, a corporation.**

14 So. (2nd) 703                                                        June Term, 1943
July 30, 1943                                                           Division B

*John M. Allison, James S. Moody,* and *Fred T. Saussy, Jr.,* for County of Hillsborough and *Anthony Schleman* and *Lewis H. Tribble* for J. M. Lee, Comptroller, appellants.

*Seth Dekle,* for appellee.

THOMAS, J.:

In its bill of complaint appellee made an attack on the assessment for taxation of its tangible personal property for the years 1941 and 1942, alleging that the valuation fixed by the assessor far exceeded the "full cash value." The tax official was said to have materially increased the sum shown in the return and this action on his part was charged to have been willful, discriminatory and deliberate resulting in a burden that was excessive and confiscatory. The answer contained a general denial of those averments of the bill directed to the value set by the assessor.

Before explaining the facts relevant to the main issue it is well to state the appellee has dealt in hardware in the city of Tampa for fifty-seven years and is a going concern with an average turn-over in stock three times yearly. The

amount of business conducted by it will be apparent from the inventory which we will later examine.

For the sake of simplicity we will only approximate in our references to figures and percentage.

In its tax return appellee listed two items: stock, represented to be worth $190,000; furniture and fixtures, $10,000. Inasmuch as the latter amount was not questioned by the Tax Assessor and was specifically recognized in the final decree there is no need further to allude to it and this opinion will be confined to the former. Another feature may be eliminated in getting at the essence of the controversy, that is, any willfulness or discrimination on the part of the officials, because it does not seem to have been shown by the testimony and does not appear to us necessary to a decision.

The particular item of $190,000 represented 50% of the inventory and was in the opinion of the taxpayer a fair sum on which should be computed the tax lien on the merchandise. When the assessment was made the assessor concluded that this valuation was too low so he multiplied by two this amount in the return and valued the property at 80% of the product. In its final analysis, then, the question for decision is whether 50% or 80% of the inventory was the correct method of calculation. It is much easier to state than to settle.

Before proceeding further it is well to quote the terse, specific provision in the statute, Sec. 5, Chapter 20723, Laws of Florida, Acts of 1941, which at once imposes a duty upon the assessor and serves as a guide in the performance of his duties with reference to the determination of the tax. It is: "The tax assessor shall assess all tangible personal property at its full cash value." We have in a previous controversy, Schleman v. Connecticut General Life Ins. Company, Fla. 9 So. (2nd) 197, drawn attention to the imperativeness of obedience on the part of assessors to this command of the lawmaking body. There is no need to reiterate here the motive which prompted the enactment, but, manifestly, one purpose of it was to accomplish taxation of all property at its real worth. In examining his action we will give the assessor the benefit of the latitude, in making his estimate,

to which by his position he is entitled as we said in Schleman v. Connecticut General Life Ins. Company, *supra,* and as the chancellor recognized when he observed: "the Court realizes the wide discretion conferred upon the Tax Assessor in arriving at his assessments. . . ."

The norm for assessment and collection has been definitely established and it was clearly the duty of the assessor to assess the property of appellee at its full cash value. This he claims to have done. On the contrary the appellee contends that the method he used in arriving at such a valuation was unjust and unfair. As we have said the matter devolves into a question of how full cash value was to be determined, one more of practicality than law. Using the same basic figures, the inventory value, one claims that 50% of the amount is correct while the other asserts that 80% is proper.

It is important to note here that this inventory value, which was apparently acceptable to the assessor as a foundation for establishing the taxable value was set by the owner. This was done by appraising each article at the lower of: (1) the cost, or (2) the market price.

Both the method accepted by the assessor and the taxpayer are apt to lead to arbitrary results because of the impossibility of establishing precisely the value of property; a thought which is not new and which was recognized by us as late as the case of Schleman v. Connecticut General Life Ins. Co.; *supra.*

We will examine the contrasting ideas, bearing in mind the handicap to appellee because of the burden of proving his case and the disadvantage accruing to him from reluctance to interfere with the appraisement by the officer.

To support his pleading appellee offered testimony of sales in bulk of stocks of similar businesses, one of them solvent, the others insolvent, but all doubtless transacted to effect liquidation. Estimates were given, too, of the amount which could be realized from the sale of appellee's merchandise. These experiences and estimates indicated that the value of the wares was between 40% to 50% of the inventory. On the part of appellants it was said on the witness stand that 80% of the inventory approached the *full cash value* for

the reason that, although the inventory reflected the lower of the cost price or the market price and showed the real worth without any reduction, nevertheless some articles were likely to have become obsolete and to cover that contingency there was an allowance of 20%.

It seems to us that evidence of sale of property in bulk is not very helpful in finding a solution of the problem. From the testimony of these transactions there appears the element of liquidation. This detracts from the value of that proof when it is relied upon to show the *full cash value* of the merchandise of a corporation established for over half a century and doing a business of one million dollars a year.

The parties in their briefs, have referred to our decision in City of Tampa v. Colgan, 121 Fla. 218, 163 So. 577, agreeing that it is, "the leading case on the question of valuation." Turning to that opinion we find the statement that the "value . . . , for purposes of taxation, is to be determined by taking into account not one, but all, favorable and unfavorable circumstances that would control the admeasurement of its *present* value were it placed upon the market to be sold by the owner." There is in the opinion also this language: "If similar property is commonly bought and sold, the price which it brings is the best test of the value. . . . But where an established market is nonexistent the process of valuation must comprehend not only one but *all* of the influencing factors going to make up intrinsic value." Although that case is not entirely analogous, as valuation of land was involved, the principles may well be applied here as we expect later to demonstrate.

It was proper for the tax assessor to consider all the circumstances we have detailed. Important among them was the method employed in arriving at the value of each item. It was valued at the cost of replacing it in the market or at the original purchase price, whichever was more advantageous to the merchant. This seems to us a means, as nearly accurate as possible, of fixing its full cash value.

The scarcity of opinions to guide us is remarkable, not that the subject has seldom been considered but because in most controversies reaching the courts of this country

statutes were involved which directed how value should be determined. For instance, we have been referred to a statement in 26 R.C.L. page 336 that "the price which the property would bring in the ordinary course of trade, is the normal test" of appraising merchandise for purposes of taxation. Sole authority for that announcement is State v. Halliday, 61 Ohio St. 352, 56 N.E. 118, 49 L.R.A. 427. An examination of the opinion reveals that a law of Ohio specifically directed that the "usual selling price," known or estimated, should be the taxable value.

There has been cited, too, a note in 61 C.J. page 649 enumerating the decisions in several states to support the statement that "cash market value or the price it would sell for . . . in the usual course of business" is the yardstick for evaluation; yet when they are studied it is patent that they shed little light on the present problem. To illustrate, a few of them are: State v. Halliday, *supra;* Willis v. Crowder, 34 N. E. 315, 134 Ind. 515, quoting a statute providing that the assessor would fix a "fair cash value, such being the market or usual selling price" or, if none, "the actual value;" Lee-Baker Dry Goods Co. v. Louisiana Tax Commission, 15 L.A. App. 237, 130 So. 877, where the statute directed that "actual cash value" should be held to mean the price property would fetch "in ordinary course of business." There is a reference too, to the case of People v. Commissioners of Taxes, 94 U.S. 415, 24 L. Ed. 164, where the New York Statutes under review provided that shares of stock should be assessed at the value "they (the assessors) would appraise the same in payment of a just debt due from a solvent debtor."

The last decision though cited to support what we will call the "usual course of business plan" introduces a different method of computing valuation and brings us to another citation furnished us by counsel, 17 Words & Phrases Permanent Edition 774, where may be found a compilation of excerpts from authorities construing the term "full cash value," but few of them are helpful to us in our search for a definite rule because most of them, as was true of those cited, dealt with a particular statutory provision. So, the

California decisions, such as Bellerino v. Mason, 83 Cal. 447, 23 P. 530, and the Idaho cases like Humbird Lumber Co. v. Thompson, 11 Idaho 614, 83 P. 941, treated of statutes expressly providing that "full cash value" meant the amount the property would be worth in payment of a just debt by a solvent debtor, People v. The Commissioners of Taxes, *supra.* See also San Francisco National Bank v. Dodge, 25 S. Ct. 384, 197 U. S. 70, 49 L. Ed. 669.

We have studied an opinion of the Supreme Court of Hawaii, Kash Co. v. Assessor, 15 Haw 476, on the proper method of arriving at the "full cash value" of a stock of goods. The facts somewhat resembled the ones in this record. The taxpayers had deducted a percentage from the inventory and the assessor contended that the inventory itself was the true indicium of the full cash value; that the deduction, therefore, was unwarranted. It is true that the court, applying a rule announced in a former case involving one parcel of real estate, commented that saleable value was the criterion, whether the sale was in bulk or piece-meal, but it is significant that emphasis was placed on the failure to account, in the inventory, for broken sizes, shopwear, slow stock, dead stock or depreciation. At first glance the case seemed to bolster appellee's position but upon scrutiny it appeared as much to support appellants' because the effect of the opinion was the approval of a deduction from the inventory for certain contingencies in an amount approximating what was voluntarily allowed to appellee by the assessor of Hillsborough County.

Recurring to City of Tampa v. Colgan, it seems to us illogical here to apply, in their entirety, the rules there announced, mainly because of the inherent difference between real and personal property. It was written there, to repeat, that when there was an established market where property of the kind then under consideration was "commonly bought and sold . . . the assessors need look no further." Even though hardware is "commonly" dealt in it appears impractical to judge the worth of appellee's stock by what it could be sold for in bulk, or for that matter, article by article, to one purchaser.

Obviously there is a market for the merchandise; a market where there may be purchased goods to replenish the stock; a market where appellee sells to the customers whom it has served for more than fifty years. There is bound to be disparity in a value fixed in the two because to the purchase price of goods bought in the former there would be added a sufficient amount when offered in the latter, to take care of overhead expense and assure a profit. Because the market price cannot be relied upon, therefore, as a definite measure of value, the assessor should weigh all the circumstances detailed by us. He allowed a deduction of 20% for depreciation and this, under the facts, seems reasonable and not ungenerous. In a business that has been operated so long by men of vast experience, doubtless the amount of "slow stock," as the Hawaiian Court calls it, is held to a minimum. This is particularly apparent when we recall that the stock "turns over" thrice yearly.

Unquestionably the taxpayer gave in its inventory the least amount that it would cost to replace the various articles sold to its customers, because the price to replace was given if less than the original cost.

We can think of no fairer way to find "full cash value" of the merchandise of a well-established, prosperous, going concern than the inventory calculated in such fashion, despite some authority that the worth to the owner is not controlling. Parenthetically, procedure employed by the taxpayer in preparing the inventory is not questioned by appellant.

The testimony which we have read carefully does not convince us that the assessor did not make a sufficient allowance for depreciation and obsolescence. That was appellee's burden. The cause proceeded more on the theory that an estimated lump sale price should determine the value than that the deduction was too small.

In arriving at his decision the chancellor was evidently influenced to some extent by Sec. 1 (k) of Chapter 20977, Laws of Florida, Acts of 1941 [Sec. 204.01 (11) Florida Statutes, 1941], for he observed that it was "persuasive that fifty percent of such value should be likewise applied to ad valorem taxes." That law deals, however, with license taxes,

not taxes ad valorem, therefore, there can be no application of it to litigation of the kind now being adjudicated. See Florida Sugar Distributors v. Wood 135 Fla. 126, 184 So. 641.

He decreed that the stock of goods should be assessed at 65% of the inventory (one half of the sum of the percentage adopted by appellant and that adopted by appellee) although it was his view that the evidence "tends to establish that fifty per cent of the full cash value is a fair and proper method of arriving at its true full cash value." He was disposed to raise the percentage from fifty to sixty-five out of consideration for the discretion of the assessor.

For the reasons we have given the decree is reversed with directions that bill of complaint be dismissed.

BUFORD, C. J., BROWN and SEBRING, JJ., concur.